We are now going to move back to case number one on our calendar and we are going to call that case number one. This is appeal 24-1599. This is United States v. Brian Gustafson. Mr. Van Zandt, I understand you will be offering the argument rather than Ms. Sostok. Mr. Van Zandt Yes, Your Honor. James Van Zandt for Mr. Gustafson. First of all, I owe the court two apologies. First, I was tardy this morning due to traffic. My apologies on that. And then second, Ms. Sostok is having a family issue right now, so that's why I'm stepping up today. Mr. Van Zandt Thank you. We appreciate you being here. The record should reflect we had a lot of snow this morning, but the snow globe has ended. James Van Zandt Lakeshore was not great. Mr. Van Zandt There you go. Very good. Well, Mr. Van Zandt, we'll begin with you now for argument on behalf of the appellant. James Van Zandt Thank you, Your Honor. What I'd like to do today is focus on issue number one, which I think is the most significant, and that is the mens rea aspect for situations in wire fraud cases where the defendant himself is not actually involved in the transaction. If you recall, Mr. Gustafson in this case was part of a small crew that burgled a storage unit that had a great deal of art in it. Mr. Gustafson, however, was not involved in the sale of that art. Rather, that was Mr. Garcia who led up this little operation and the third co-defendant. The government decided to charge this case as a wire fraud case. It's not a burglary case. It's not a theft case, and it's not even a garden variety fraud. This is wire fraud. So one of the issues of trial had to do with whether or not Mr. Gustafson was aware that there could be a wire transaction involved in selling the art. All of the evidence at trial indicated that to the extent that Mr. Gustafson was aware of this, the plan was to sell all of the art for cash. The counsel is not just aware. It's also whether it was reasonably foreseeable, correct? Well, precisely, Your Honor. There's three ways that the government can prove this. The first is actual knowledge, which is not present in this case. The second one is whether or not a wire transaction would occur in the ordinary course of business. And, of course, the third is facts from which Mr. Gustafson could reasonably have foreseen it. Those are the two. Are the last two really as distinct as I know our case law seems to make them? I mean, it sounds like a very law review-y kind of distinction between the two. I mean, wasn't there a great significant overlap between ordinary course of business and what's reasonable for it? I think that's a fair way of putting it, Your Honor. The bottom line is did Mr. Gustafson actually know or is there reason for him to believe that a wire transaction would be involved? So one other way of looking at it, I guess, might be to say that the test is reasonable foreseeability and that one way that you might prove reasonable foreseeability one way is by showing that in the normal course of business a check would be used. That's absolutely right, Your Honor. And I think the interesting part about this test is that it focuses on whether or not a wire transaction is routine in the course of business we're talking about. Now, in this particular case, we're discussing not necessarily pawn shops exactly, but we're talking about shops that buy and sell antiques, old coins, things like that. So the question then becomes what is the ordinary course of business? I think you make a good point there, sir. Should we look at this from the point of view of the purchaser or from the point of view of the seller in the secondary market? From what point of view do we look at to determine ordinary course of business? The jury actually asked that exact question, Your Honor. I think that it obviously depends on what Mr. Gustafson knew, and all he knew about these transactions was what he had done with Mr. Garcia previously. That had been obviously smaller transactions, but every single one of them had been cash transactions. Interestingly enough, even when the owner of Crescent Jewelers testified at trial, he said that checks were not exactly the most common thing. It was about 50-50 between cash and checks. Particularly in this case, there was no expectation of a check being used at all when Ms. Rothschild and Mr. Garcia went to sell the items. The only reason that they accepted a check at all was because there was not enough cash for the entire transaction. On the other hand, this wasn't a transaction where one side was an admitted offense. The fact of the matter is the seller was holding themselves out as a legitimate settler of an estate, in effect, and was willing to give documentation. Precisely, Your Honor. That's quite important. In those situations, wouldn't it be more common that a check might be used than if the purchaser were dealing with offense? Not actually, Your Honor, at all. The owner of Crescent Jewelers testified, it's about 50-50, and it depends on what the buyer wants to do. So while checks can be used in this process, it's by no means routine or even required compared to some cases. No, but there's a 50% chance they're going to use a check, right? The test is whether or not Mr. Gustin knew it would occur in the ordinary course of business, or whether it's routine to use checks. Now, I don't think we can say that in a 50-50 business where you could do cash, you could do checks, that Mr. Gustin had any reason to believe there would be checks. If you recall from the record, Mr. Garcia didn't even have a checking account. He didn't have a banking account. Checks were useless to him, which, of course, is why Ms. Rothschild pushed back so hard when the owners of Crescent Jewelers wanted to give her a check as partial payment. The items that were presented to this jury are not common items. This is not what Garcia and Gustafson were doing earlier. These are tremendously out-of-the-ordinary items that smack, frankly, of being expensive. People don't routinely purchase very expensive items like this without engaging in some type of wire transfer. Then we get to the standard review, and that's really an issue because the jury had that before them as to, by looking at those five items, is that something that would be not paid for in cash but paid for through a wire transfer? That's a great point, Your Honor. The interesting thing about this case is that it's undeniable that Crescent Jewelers was completely legitimate. They were not involved in this business at all. They had no reason necessarily to believe that these were stolen items. We're talking about our items here, yet Crescent Jewelers was quite comfortable giving, I think it was $50,000 cash, as part of this transaction that they believed was legitimate. So to say that in the regular course of business, which would be Crescent Jewelers, that therefore must be wire transactions involved in that is simply not supported by the evidence. There was conversation about out-of-state purchasers as well, though. Isn't that correct? I think there was briefly, Your Honor. Now, the government obviously harps on this quite a bit. When Mr. Garcia was testifying, he was very clear that ultimately what he told Mr. Gustafson was that it would be a local buyer. So even if there was some discussion of out-of-state people, that doesn't necessarily mean a wire transaction would have to happen. They could come into Illinois and receive cash. Mr. Garcia could go to them and receive cash. The bottom line is wire transactions are not required, and they're certainly not a routine part to the extent that Mr. Gustafson would believe that there must be a wire transaction involved. Now, recall, too, of course, he had no idea where Mr. Garcia was going for this, nor did he even have any idea that the second transaction in early May even happened. If you recall, Mr. Garcia testified that he completely cut out Mr. Gustafson after the first transaction because he was being greedy. So Mr. Gustafson had no idea that even after the first transaction in April where Ms. Rothschild did receive a check, he had no idea that it even happened. Now, I could certainly see if this was a situation where they were required to take a check in the first transaction, Mr. Garcia comes back, tells Mr. Gustafson, hey, we had to do a check. That could be sufficient, but that's not what we have here. If you recall, one of the cases that we cited was the Bentz, this is the Third Circuit opinion, the scrapyard case, where the scrapper paid by means of a check that was completely unexpected. And in that situation, the Third Circuit found that that was not sufficient to meet the mens rea requirement. Similarly enough, in Walters, which I believe was a Seventh Circuit case, the court found that there was no reasonable foreseeability in the, this is the college athlete case, there was no reason for the defendant to know that the university itself would send out via the mails the eligibility paperwork to the Big Ten. So in that situation, even though it was fairly, let's call it routine, for the university or for the scrapper to pay by check, there's no reason for the defendant, who's what we're focused on, to actually know that. Now that of course takes us to White and Shenneman, which are the other two cases that we've discussed. Now the converse there is these were individuals who were highly experienced real estate closing agents. They knew how the title business worked. And in that situation, there's no doubt that they absolutely had reason to know that there would be a wire transaction involved. Contrast that to the facts that we have here. Mr. Gustafson is a manager, basically just the guy at the desk of a public storage facility. He has no specific knowledge about selling antiques or anything like that. The only thing that he's done so far is work with Mr. Garcia to sell things for cash that he finds around the area. I certainly take your point, Your Honor, about the value of these pieces. But the fact of the matter is these were sold for cash to legitimate buyers without too much of an issue. I think the forfeiture amount here is nearly half a million dollars, right? Now that's over four counts, not just the two counts of Gustafson. But that's a lot of money for cash, isn't it? Absolutely. But remember, too, they weren't selling all this at the same time. The very first transaction at the coin dealer, whose name is escaping me right now, that wasn't terribly big. I think it was about $10,000, of which Mr. Gustafson was given only a part. And that was conducted in cash. So it's not unusual at all in this sort of industry to pay for things that are of fairly large value in cash, which is, in fact, what did happen in the April and early May transactions. I'd like to reserve the rest of my time for rebuttal unless there are any other questions. Well, thank you, Mr. Van Zandt. Thank you, Your Honor. We'll now move Ms. Guzman to you for argument on behalf of the government. May it please the Court. Kelly Guzman on behalf of the United States. The evidence at trial was sufficient for the jury to find that the defendant could reasonably have foreseen the use of the wires in the execution of this scheme. The facts the defendant knew that informed his reasonable expectation here, the defendant knew that the unit contained very valuable items. He was the person who first saw the unit a couple months before the pandemic, walked by it when the door was open, and the victim was in the unit, and remarked to the victim after looking inside, nice stuff. Do you think Mr. Gustafson ever even thought about this whole issue? About what? Whether checks were going to be used or not. I don't. And actually, I think that Garcia's testimony is instructive on that point. If you look at, and this relates to something that counsel just argued, if you look at the cross-examination of Garcia when he's pressed on, you wanted cash, not checks. And checks weren't part of the plan, were they? Garcia responds at page 569, at the time, I probably just didn't care. The plan was just to split the proceeds three ways, no matter how it came back. I think that was Garcia's testimony, obviously, as to his own state of mind, but I think you can take that as instructive of the co-schemers in this case, particularly because of the number of conversations that Garcia and the defendant had about Garcia's ongoing attempts to sell these items, how he was doing it, what types of different buyers he was contacting. Now, this raises, of course, something that I, it's the 500-pound gorilla in the room in this case, I think. From the moment I opened the blue brief in this case and started work on the case, why wasn't this tried as a theft in state courts? This is kind of a stretch to say this is a wire fraud case. Judge, I don't know that the victim buyers in this case would have felt that way. I mean, I think the victim whose $2 million of valuables were stolen was one victim of this scheme, but I think that the legitimate businesses who paid hundreds of thousands of dollars and in heavy reliance on the misrepresentations that were made to them about the provenance for these items and the false representations of ownership that Marilyn Rothschild made to their face, both of the victim buyers in the charge transactions, Mr. Craft and Mr. Crescent, testified that these were family-run businesses that they had run for their entire life's work. And they testified to their attempts to check up on the story that Marilyn Rothschild gave them. They Googled her. They did Internet research. They found her family online. They found photos of them. They confirmed that her father was a World War II veteran. And this was all happening during the pandemic when business and sales were uncertain and they were trying to take care of their businesses. So I think that this was certainly a wire fraud case in the sense that these very real victims were absolutely deceived by this scheme. And the defendant was a knowing participant in that part of the scheme, and there was ample evidence of that in the record. You know, like I said, the defendant is the one who identified the unit in the first place, and that's significant here because defendant is the one who recognized the opportunity to steal and sell these items. And the opportunity in these items is not to steal them for their personal possession but to sell them through deceit to people who could pay close to what they were worth. He also is the person who gave the key to the unit to Garcia, and there was testimony from Garcia and also from the agent about an interview of the defendant in which the defendant made statements that corroborated Garcia's testimony, that Garcia was talking with defendant on an ongoing basis about the types of buyers he was finding and the ways that he was going to sell these items. Specifically, Garcia did tell defendant that one of the buyers was from New York. The record does not show that defendant only knew about local buyers. At page 589-90 of the transcript, Garcia testifies that he told the defendant about one buyer in New York. So the defendant knew that at least one buyer was out of state. Garcia also testified that there were multiple conversations about the buyers he was looking for. Defendant agreed that there were also stated to the agent who testified that Garcia had had multiple conversations with him about that. In fact, after his first in-person interview with the agent, the defendant called the agent back to offer him additional information about other buyers that Garcia had told him about during the course of the investigation, and that was voluntary on the defendant's part, offering additional information about all the buyers that he knew about and all the different attempts that Garcia was going to make to cast a wide net here and attempt to offload all of these stolen goods. At that point, does Mr. Gustafson know indictment is possible? When he's having the conversation with the agent? He knows that he's been approached by an agent, and I think at that point, in the first interview, they had told him some of the things that you're telling us aren't adding up. We want to give you a chance to clarify, and that's when he admitted that he had received payments for acting as a lookout. So I think at that point, I don't know whether he specifically foresaw an indictment as such or a federal case, but he knows that he's being talked to by the agents, and the government argued to the jury that that first interview with the agent was an attempt to cooperate in the investigation but also to minimize his role in the conduct and to control how he was seen by law enforcement. And so I think he was, at that point, certainly conscious of the fact that he was being investigated and that he could be charged with a crime. And this is somewhat beside the point, but Mr. Gustafson gets two years in prison, correct? Yes. Ms. Rothschild gets probation, is that correct? That is correct. And Mr. Garcia is being sentenced next month. Correct, yeah. I'll return to, I think that there is also ample evidence in the record that defendant knew a lot about the false provenances here that were going to be used, and I think that's important because that shows that the defendant knew that these were legitimate transactions with buyers who wanted convincing guarantees of ownership, not the type of black market or under-the-table transactions that you might expect solely payment and cash in. He knew before this scheme was even undertaken, he got to know John Garcia and understood that Garcia was selling items for Marilyn Rothschild that belonged to her father, that he was actually trying to help her sell some items from her estate. He also saw Marilyn Rothschild at the facility with Garcia day in, day out while they were stealing these items together. So there were a lot of facts known to the defendant about the degree to which they were going to have to offer a false provenance here and defraud buyers in order to sell these items. I would also distinguish this from their prior course of transactions, not only in the type and value of the items that they were selling, but the fact that these items were under lock and key, which is a strong signal to their value. Previously they had been selling abandoned or discarded items that owners had left behind, things that they pulled from dumpsters. At one point they were talking about $0.25 slides that they were taking out of a dumpster, but here this was a unit that had been locked and, you know, that contained belongings that somebody did not want stolen because of their value. So this was a very different course of conduct that they were entering into. Did it surprise you that items of that value would be kept in a public storage facility? Yes, Judge. Okay. It did. And I think that it might have surprised defendants as well because he did research on the owner of that unit to determine not just his name, but also to determine that he worked at Citadel. And so at the time that they undertake this scheme, he knows not only do these items look apparently obviously very valuable, but that they belong to a high net worth individual, meaning that they are likely authentic as well. Taking the record as a whole, do we have any idea to what extent these three sold the items in interstate commerce? In other words, beyond the boundaries of LFI? The record evidence only showed two transactions at Glenview Coin and Collectible referenced by counsel and then the two transactions with Kraft and Crescent as well as the third that was interdicted before it was completed. I see. Thank you. I also wanted to point out to the court in reference to one of your Honor's earlier questions that to the extent that the court is considering the defendant's knowledge that these payments would occur in the ordinary course of business, the Seventh Circuit pattern instruction states that the relevant course of business is the course of business in furtherance of the scheme. And so the reference would not be the course of business of a particular auction house in this case because the transactions that were planned by the scheme were not concerning a particular auction house. It would instead be the ordinary course of business required to accomplish the scheme. And in this case, the scheme was casting a broad net. The scheme was to sell $2 million worth of over 150 valuable items to whoever they could find to buy them. Do we have any other information as to how they went about searching for purchasers? We have the information that Garcia testified to, which is that he— so the information we have that's in the record is that the defendant— Garcia made an intentional effort to form a relationship with the defendant that included expressing to the defendant all the different people he knew who could buy different types of things to build that relationship with him. The conversations that Garcia had during the course of the execution of this scheme, which included at one point Garcia testified, he was shown an image of himself on surveillance footage showing his phone screen to the defendant, and defendant Garcia testified he was actually showing an offer that he had received on his phone screen to the defendant. So the efforts to—defendant's knowledge of the efforts to sell or the building relationship up until that point and Garcia holding himself out as somebody who could sell a wide variety of items, Garcia's conversations with him during the scheme, Garcia's conversation with him about the buyer in New York, and then the other evidence of that is the defendant's call back to the agent that the agent testified about where he's offering additional information proactively on all the other buyers that Garcia described to him. If the court has no further questions. No, thank you, Ms. Guzman. Thank you, Your Honor. Mr. Van Zandt, we'll go back to you now for rebuttal argument. Thank you, Your Honor. So I'd actually like to return to Judge Ripple's point earlier about the 500-pound gorilla. That's really what this case has always been about is should this be in federal court or not. There's no real dispute that the government satisfied its obligations to prove that Mr. Gustin was part of the scheme and that he was involved in the burglary of the units, but as it was pointed out, that's not a federal case. What makes this a federal case is the use of the check and the wires between the banks in Illinois, and I think they were somewhere in New York. That's the issue. What I've heard the government talking about up here is the value of the items, the knowledge that Mr. Gustin had about the scheme. What I haven't heard about is any discussion about Mr. Gustin's knowledge of how these things would be paid for. That simply just wasn't there, and that wasn't one of the things the government was able to prove at trial. All of the evidence here that Mr. Gustin knew about was that these things were to be sold for cash and, as far as he knew, were sold for cash. Mr. Garcia never told Mr. Gustin that Ms. Rothschild had received a check from the April transaction, never even told him about the May transaction. Well, what kind of knowledge does your client have to have? I mean, what kind of intent does he have to have? It's a knowledge level, Your Honor. It's what? Knowledge? So we're not talking about specific intent or something like that. The question is, did he know that a wire transaction or check, in this case, would occur as part of the ordinary course of business, or did he have specific knowledge for which that could be reasonably foreseen? Now, the reasonable foreseeable— Getting back to Judge Brennan's question, though, isn't it really—could a reasonable jury make inferences that it was reasonably foreseeable? Then the question becomes on what facts, Your Honor. That's the real issue here, is could it have theoretically been proven somehow? Sure. We could have had more testimony about how the auction industry worked, how the antique sale industry worked. What we do have is the testimony of the owners of Creston Jewelers saying that, yeah, when we do this sort of thing, it's really up to the buyer how they want to pay, and it can be cash or check, and we'll accommodate them. I think even in advance of the first transaction in April, one of the buyers got $50,000 in cash ready to go before the transaction even happened. So this is not unusual at all. This is certainly a way that business is done. Now, to be fair, business is also done by check, but in this situation, Mr. Garcia had no interest in getting a check. There's no evidence whatsoever that anyone talked about receiving a check with Mr. Gustafson, and he was certainly not involved in the planning for the sale or the sales themselves. And that's really what it comes back to, is what did Mr. Gustafson know? That's the bottom line in this case. We're not talking about what Mr. Garcia knew. We're not talking about what Ms. Rothschild knew. We're not even talking about the expense of the items or that he was involved in this burglary. If reasonable foreseeability, though, is a layperson's standard, don't we defer to the jury on that? To an extent, Your Honor. And obviously we wouldn't have appeals if we deferred to the jury in all situations. And this is a fine point, to be clear. This is a very fine point of federal jurisdictional law, and I think it's something that's very easy for a juror to look past and not quite get. If you recall, there was a question that the jury submitted on this very issue, and essentially the answer that we all came up with was read the instructions. They're all important. And I don't know if that helps. And there were no lesser included or alternative means by which the jury might conclude theft versus wire fraud? No, this was it, Your Honor. It was a very targeted one-count case. Had this been in state court, totally different situation. There's fraud cases in state court. They could have done theft. They could have done burglary. But the government chose to make this a federal case, and by choosing to make this a federal case, they took on these obligations, one of which is to prove, beyond a reasonable doubt, that Mr. Gustson knew that a wire transfer or a check in this case would occur as part of the routine order of business. With that, I've got 15 seconds left. If there are any other questions, I'm happy to answer them, or if there are any other questions about issues we've raised. No. Thank you very much, Mr. Van Zandt. Thank you for being here. Thank you, Your Honor. Thank you, Ms. Guzman. The case will be taken under advisement.